## Goode v. Commonwealth.

(Decided December 11, 1931.)

J. R. WHITE for appellant.

J. W. CAMMACK, Attorney General (BASIL P. COOPER, of counsel), for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE DIETZMAN—
Reversing.

Appellant was convicted of the offense of violating our present prohibition law, and, this being his second offense, he was sentenced to serve two years in the penitentiary. He appeals.

The sole ground relied upon for reversal is the claimed error in the admission of the testimony of J. Wood Vance, an attorney of the Barren County Bar. In order to properly understand this contention, a short resume of the other evidence introduced in this case is necessary. Vance, together with A. G. Britt, a deputy sheriff of Barren county, was riding along one of the county highways after dark in July, 1930. They came upon three or four cars parked along the side of the road, and, thinking there was a wreck, they stopped their car to investigate. At that time, appellant was either standing or sitting on the running board of one of the parked cars. As Britt and Vance approached, appellant arose or stepped off the running board of the car where he had been seated or was standing, and crossed the road to the other side. As Britt and Vance neared the car, the driver thereof started the car up and ran down the road about 200 yards and stopped. The deputy sheriff pursued the car, and, when it stopped, he came up to it and found therein 42 containers of moonshine whisky; each container holding about half a gallon of the liquor. He also found the appellant's hat in the car. The driver of the car kept calling for appellant, but the deputy sheriff admitted that the driver of the car claimed that the whisky therein belonged to him. There was no other evidence for the commonwealth tending to connect the appellant with the ownership of the whisky or its possession other than that detailed above and the testimony of Vance, the admision of which is complained of. Before taking that up, it may be stated that appellant denied the ownership of the whisky; accounted for his hat being in the car by stating that he came upon the car stalled in the road and was helping its occupants get it started, and had put his hat in the car while he was working. He admitted that earlier in the day he had bought some oil or gas for this car, but denied that there was any whisky in it at that time. Coming now to the testimony of Vance, it appears, that, as stated, he is a member of the Barren County Bar. Over the objection of the appel-

lant, he was permitted to testify that when he and Britt came up upon the appellant, and he had found out that there was whisky in the car, he solicited the appellant for employment as his attorney, and that he advised Goode that if he had anything to do with the whisky he ought to get away from there and hide before anybody saw him, and that Goode replied that he would see Vance in the morning. The next morning he came to Vance's office to find out what Vance would charge him to defend him, and Vance replied that it would cost appellant $300; and that in this conversation, looking towards the employment of Vance, appellant admitted the ownership of the whisky. We take this from the transcript as to what happened on the scene when the cars were found stalled.

"Q. Now, Mr. Vance, when you were having this conversation with Mr. Goode, he was contemplating employing you as his attorney, wasn't he? A. No, sir. I was asking him to employ me. I told him I could get him out of it but he didn't have enough sense to let me.

"Q. You don't mean you were asking him to employ you? A. Certainly. I just told him this—I knew he was caught redhanded and I said: 'Charles Henry, get home and get to bed and forget this, and don't claim that you own any of that liquor.' He was drunk and staggering all over the road. He asked for his hat and Grover (Britt) got his hat and I said: 'Charles Henry, you will go to the pen for this.'

"Q. And that if he would employ you, you would get him out? A. Well, he employed you and lets see whether he gets out or not."

The testimony overwhelmingly establishes that Vance, with callous disregard of the ethics of the profession condemned alike by this court and the Attorney General, was soliciting employment in this case, and that the appellant had entered into negotiations with Vance looking towards that employment, and that it was in the course of these negotiations that the admissions of appellant were made, and that the negotiations split on the question of the fee Vance was to get. Civil Code of Practice, sec. 606, subd. 4 provides, that communications between attorney and client are privileged, and we have here presented the question whether or not a communica-

tion between attorney and prospective client made pending negotiations for a retainer are within this privilege. In Wigmore on Evidence, vol. 4, sec. 2304, it is said:

"It would seem plain, by the reason of the privilege, that, since the would-be client cannot certainly predict the attorney's acceptance of the employment, the former must be protected in his preliminary statements when making the overtures, even if the overture is refused. It would further be immaterial that the refusal was due to a disagreement as to fees and to the client's own withdrawal by reason of the fee demanded; for upon none of these matters could he predict, the result until his preliminary statement had been made."

In support of the text, a number of cases are cited in the footnote. In the case of Clary v. Blackwell, 160 S. C. 142, 158 S. E. 223, 226, the facts were that the defendants, in a suit arising out of an automobile accident, consulted a lawyer by the name of Speer, who advised them to settle the case, if they could, for a named sum. This they tried to do. On failing to accomplish their purpose, they returned to employ Speer, but, being unable to agree upon the fee, they did not do so. On the trial of the suit, Speer was permitted to testify as a witness for the plaintiffs, stating that he did not consider himself employed unless he had been paid something. In passing on the admissibility of Speer's testimony, the Supreme Court of South Carolina, in holding it inadmissible, said:

"When a person goes into the office of an attorney to consult him regarding a matter, necessarily the matter involved must be discussed to some extent before the attorney can be in a position to give advice, or to set a fee for the work the party wishes done. . . . In our opinion the conversation, or communication, Mr. Speer had with the defendants was privileged, and the testimony in question should not have been admitted."

Applying these principles to the instant case we are clearly of the opinion that the communications between appellant and Vance, made under the circumstances here shown in evidence, are privileged, and the court erred in their admission. Their prejudicial effect cannot be doubted. The judgment is reversed for a new trial consistent with this opinion.